NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240757-U

NO. 4-24-0757

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 5, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* G.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 21JA77 |
| v. | ) | |
| Dakota B., | ) | Honorable |
| Respondent-Appellant). | ) | Christopher G. Perrin, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Doherty and DeArmond concurred in the judgment.

**ORDER**

¶ 1     *Held:*   The appellate court affirmed the trial court's termination of respondent's parental rights because the court's fitness and best-interest findings were not against the manifest weight of the evidence.

¶ 2     Respondent, Dakota B., is the father of G.B. (born April 2021). (We note that the mother of G.B. is not a party to this appeal.) In February 2024, the trial court found respondent was an unfit parent under the Adoption Act (see 750 ILCS 50/1(D)(a), (b), (c), (m)(i), (m)(ii) (West 2024)), and in June 2024, it found termination of respondent's parental rights would be in the minor's best interest.

¶ 3     Respondent appeals, arguing that the trial court's (1) fitness and (2) best-interest findings were against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5                                 A. Procedural History

¶ 6             In May 2021, the State filed a petition for adjudication of wardship, alleging G.B. was neglected in that (1) he was not receiving the proper care for his well-being due to his mother's failure to "make a proper care plan" and "cooperate fully with intact services" (705 ILCS 405/2-3(1)(a) (West 2020)) and (2) his environment was injurious to his welfare due to his mother's mental illness (*id.* § 2-3(1)(b)). The identity of G.B.'s father was unknown.

¶ 7             That same month, the trial court conducted a shelter care hearing and placed temporary custody and guardianship of G.B. with the guardianship administrator of the Illinois Department of Children and Family Services (DCFS). The court's temporary custody order required "[a]ll putative fathers [to] cooperate [with] DNA testing." (We note that respondent was not identified as G.B.'s father until March 2022, after the adjudicatory and dispositional hearings had already occurred.)

¶ 8             In January 2022, the trial court adjudicated G.B. a neglected minor as alleged in the petition.

¶ 9             In February 2022, the trial court conducted a dispositional hearing, at the conclusion of which it (1) adjudicated G.B. a ward of the court and (2) placed guardianship and custody of G.B. with the guardianship administrator of DCFS.

¶ 10            In March 2022, respondent's paternity of G.B. was established through DNA testing, the results of which were filed with the court. That same month, the trial court entered an order (1) appointing counsel to represent respondent, (2) granting an emergency motion for a protective order filed by the guardian *ad litem* (GAL) (a copy of which does not appear in the record on appeal), and (3) issuing a writ for respondent, who was in the custody of the Illinois Department of Corrections (DOC) at Shawnee Correctional Center, to appear by video at the next court hearing.

¶ 11      In June 2022, the GAL filed a "Motion for Protective Order to Halt Visitation Indefinitely," alleging that (1) respondent's paternity of G.B. was established on March 23, 2022, (2) respondent was "currently incarcerated at Shawnee Correctional [Center] for the offense of aggravated criminal sexual abuse to a victim over five years of age in Macoupin County [(case No. 21-CF-288)], for which he was sentenced to five years in [DOC]," (3) respondent's projected parole date was January 12, 2024, (4) his projected parole discharge date was January 12, 2025, and (5) G.B. had never met respondent. The GAL argued that bringing then-one-year-old G.B. to a prison to visit a father he had never met and who was unlikely to retain his parental rights was not in G.B.'s best interest because it would cause him trauma and not serve any "positive purpose."

¶ 12      Later that month, the trial court conducted a hearing on the GAL's motion, at which respondent appeared by video and was represented by counsel. The court granted the GAL's motion and entered an order prohibiting DCFS from providing visitation between respondent and G.B.

¶ 13                    B. The Termination Hearing

¶ 14      In May 2023, the State filed a motion for termination of parental rights and, in August 2023, a supplemental motion for termination of parental rights (which is the subject of this appeal), alleging that respondent was an unfit parent because he (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to G.B.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) abandoned G.B (*id.* § 1(D)(a)); (3) deserted G.B. for more than three months preceding the commencement of the termination proceedings (*id.* § 1(D)(c)); (4) was depraved (*id.* § 1(D)(i)); (5) failed to make reasonable efforts to correct the conditions that were the basis for the removal of G.B. from respondent within the nine-month periods of

January 13, 2022, to October 13, 2022, and October 13, 2022, to July 13, 2023 (*id.* § 1(D)(m)(i)); and (6) failed to make reasonable progress toward the return of G.B. to respondent during the same nine-month periods (*id.* § 1(D)(m)(ii)).

¶ 15                                     1. *The Fitness Proceedings*

¶ 16         On separate dates in January and February 2024, the trial court conducted the fitness portion of the termination proceedings. We note that respondent appeared with counsel during the January hearing, but respondent did not personally appear at the February hearing because he violated his parole and was back in prison; the court denied counsel's motion to continue the February hearing.

¶ 17         At the State's request, the trial court admitted into evidence a certified copy of conviction in Macoupin County case No. 20-CF-288, showing that in June 2021, respondent was found guilty of aggravated criminal sexual abuse, a Class 2 felony (720 ILCS 5/11-1.60(d) (West 2020)), and was sentenced to five years in prison. The charging document underlying the conviction alleged that in October 2020, respondent committed an act of sexual penetration with a victim who was over 13 years of age but under 17 years of age.

¶ 18                                     a. McKenzie Vorreyer

¶ 19         The State called McKenzie Vorreyer, who testified that she was employed by DCFS and was the caseworker from June 2021 to May 2023. Vorreyer testified that she received DNA results showing respondent was G.B.'s father on March 23, 2022. He was in prison at the time for a sex offense. Vorreyer "reached out to *** set up *** an integrated assessment to see what services he would require." Respondent completed the integrated assessment but never completed any of the recommended services, which were (1) parenting classes, (2) mental health services, and (3) completion of a sex offender risk assessment.

- 4 -

¶ 20    Vorreyer testified that respondent was incarcerated the entire time she was the caseworker. She never went to the prison to meet with him but did communicate with him by phone. She went over respondent's required services with him in April or May 2022 and mailed copies of his service plans to the prison, although she did not use certified mail and could not be certain that he received them.

¶ 21    Vorreyer testified that she made respondent aware that he needed to complete his services if he wanted to obtain custody and guardianship of G.B. However, Vorreyer stated that respondent reported that he was unable to complete any of the services because "[t]hey didn't offer those programs while he was incarcerated. That was something to possibly do whenever he was out of [DOC]."

¶ 22    She later testified on cross-examination that she went over each applicable service plan with respondent, which she estimated was three or four separate occasions. Each time, he told her he was unable to complete the services while incarcerated. She also spoke with a prison counselor at Shawnee Correctional Center, who told her "they don't do those services in [DOC]." Although he was moved to two other facilities, she did not speak with any other counselors from those facilities.

¶ 23    Respondent was never released from DOC while Vorreyer was the caseworker. The protective order was never lifted, so respondent never visited with G.B., although prior to the entry of the order, he had expressed to Vorreyer an interest in doing so. Vorreyer also testified that had he completed the assessment and been assessed at "zero or low risk" to reoffend, he would "[l]ikely" have been approved for visits. She also stated that, although respondent had her contact information, he never sent any notes, gifts, or letters for her to give to G.B.

¶ 24 Last, the GAL asked Vorreyer, "Whose actions resulted in [respondent's] being incarcerated?" Vorreyer answered, "[Respondent's] actions."

¶ 25 b. Christina White

¶ 26 Christina White testified that she was employed by DCFS and was the caseworker on respondent's case from September 2023 to December 2023. White testified that she knew respondent was incarcerated in DOC but also knew he had changed locations. She did not know which facility he was in when she took over the case. Because she did not have his current contact information, she did not have any contact with him. She did not attempt to learn his location because "the goal had changed by that point," explaining later in her testimony that the case was "already set for termination trial."

¶ 27 White also testified that had respondent contacted the agency, any messages would have been forwarded to her, but she never received any such messages.

¶ 28 On cross-examination by the GAL, White testified that, when she took over the case, respondent was still unable to complete any services because he was incarcerated and the order prohibiting visitation with G.B. was still in place.

¶ 29 c. Jewel Waddy

¶ 30 Jewel Waddy testified that she was employed by DCFS and was the current caseworker, having taken the case over from White in December 2023. When she took over the case, respondent was still in prison. She neither contacted him nor received any message that he had contacted the agency. Waddy stated that at no point during her involvement in the case was she ready to return G.B. to respondent.

¶ 31 On cross-examination, Waddy stated she was unaware that respondent had been released from prison on January 12, 2024. (We note that her testimony occurred on January 18,

2024, meaning he had been released six days before the hearing.) She testified, however, that parenting classes take three to four months to complete. She did not know if he had completed a sex offender evaluation.

¶ 32    On redirect examination, Waddy testified that respondent had not contacted her upon his release. On recross-examination, she stated that, although he did not have her direct contact information, he did have the agency's contact information.

¶ 33                                    d. Alexandra B.

¶ 34    Alexandra B., who was G.B.'s mother and a respondent at the fitness portion of the termination proceedings, testified primarily about her own portion of the termination proceedings. However, when asked by the prosecutor about her "thoughts on [respondent] and his sexual conviction against a minor and being the parent of [G.B.]," Alexandra testified that respondent "never gave me no help." She also testified, "[R]ight after I told him that I thought I was pregnant with his child, he came off and told me well, you know, I believe you and then later said I thought you were joking." She believed this conversation occurred sometime in 2020, before he went to prison.

¶ 35    When asked why she did not tell DCFS that respondent was G.B.'s father, she said she did not know for certain he was indeed the father, explaining, "There was a lot of guys that I had got with in my past, so I had named off a lot of names of guys to DCFS for them to test."

¶ 36    Alexandra B. testified that she spoke with respondent in August 2022 after he had been confirmed to be G.B.'s father and he told her he was going to try to do the services in prison. She also testified that she "was having contact" with respondent prior to the fitness hearing. Respondent's counsel asked if respondent expressed to her any desire to engage in

visitation with G.B., and she answered, "He didn't tell me anything about like really about that, like, he wanted to express I don't think any of that."

¶ 37                                    e. The Trial Court's Findings

¶ 38        The trial court found that the State had proved by clear and convincing evidence each of the allegations in the supplemental motion for termination of parental rights except the allegation of depravity. The court acknowledged that a court order prevented respondent from visiting with G.B. but observed that "he did not send cards, letters, [or] gifts" and "[h]e didn't maintain contact with the caseworkers." On that point, the court stated that communication was "a two-way street" and respondent did not notify anyone when he was moved to different facilities. The court additionally noted that respondent did not notify DCFS when he was released from prison and say, "[H]ey, I'm out of prison, what do I need to do?" Instead, respondent found himself back in prison shortly after his release.

¶ 39        The trial court acknowledged that respondent did not have the ability to complete services while he was in prison but observed that "Illinois law doesn't make an exception for that." The court continued, "Under Illinois law, the effect of a parent's incarceration as it relates to allegations of failure to make *** reasonable progress, there is no exception for time spent in prison." The court found that the evidence was "clear that [respondent] did not make reasonable progress on completing the tasks that were in the service plans."

¶ 40                                    2. *The Best-Interest Proceedings*

¶ 41        In May 2024, the trial court conducted the best-interest portion of the termination proceedings. Respondent personally appeared with his attorney. At the State's request, the court took judicial notice of "the unfitness findings, the orders and the hearing[s] that [were] held [in January and February 2024]."

¶ 42                                        a. Waddy

¶ 43         The State again called Waddy, who testified that she was G.B.'s caseworker until March 2024, when she handed that responsibility to Jennifer Power. Waddy testified that G.B. had just turned three years old and was living with foster parents "Mike and Molly," who specialized in behavioral issues. She stated that G.B. was initially placed with Mike and Molly for six months, then went to live with a great-aunt for approximately nine months, and then returned to Mike and Molly, who were his current foster parents. Waddy testified that the great-aunt "ended up moving" and could not care for G.B. any longer.

¶ 44         Waddy testified that in his current foster home, G.B. had "made a lot of progress[ ] behaviorally" and that his medical, educational, emotional, and social needs were being met. She stated that G.B. was in daycare and participated in occupational therapy. He also had asthma and "has to have a pump when needed." She stated that Mike and Molly "are really good with that."

¶ 45         Waddy testified that G.B. was bonded to his foster parents, calling them "Mommy and Daddy." Mike and Molly wished to adopt G.B. Waddy also testified that she observed G.B.'s bond with Mike and Molly, as well as the other individuals living in the foster home, which included two older children and Molly's mother. G.B. called Molly's mother "Gammy" and "always wants to be around her."

¶ 46         On cross-examination by the GAL, Waddy testified that G.B. had no bond with respondent.

¶ 47                                        b. Jennifer Power

¶ 48         Jennifer Power testified that she was the caseworker for G.B. from mid-March 2024 to the present. She visited the foster home twice a month since receiving the case. G.B. was

receiving speech therapy, occupational therapy, and behavioral therapy. She had also referred him for early intervention rehabilitation services. Power testified that G.B. was well cared for and happy in his foster home. His foster parents used appropriate discipline, such as time-outs and redirecting him. Powers stated that "there's definitely a bond there."

¶ 49 She also testified that G.B. reached out for his foster parents when he wanted comfort and called them "mom and dad." She believed that G.B. was progressing in his foster home, which was an adoptive placement.

¶ 50 Power testified that G.B. had not interacted with respondent at all during her time on the case, referring to the protective order prohibiting visitation, and that respondent had never sent any gifts, letters, or cards for the agency to deliver to G.B.

¶ 51 c. Respondent

¶ 52 Respondent testified that he never talked to anyone from DCFS, stating, "I've never seen their faces until I stepped into this courtroom." He stated that he never made any attempts to reach out to the agency because he "didn't have the ability to do it from in [prison]." Respondent explained, "The only way you can do that is to have family[,] loved ones reach out for you or have a counselor in the institution reach out for you, and I didn't have neither one of those as an aid to help me in the process."

¶ 53 Respondent testified that he was still incarcerated and was scheduled to be released in two more months, on July 30, 2024. He stated that, upon his release, he would live with his father, who was helping him to secure employment through the road commission. He testified that his father lived on a farm in a four-bedroom house, where there would be "[m]ore than enough" space for G.B. to have his own room. He said that his family, including his mother, father, and sister, would be a support system for both respondent and G.B. if his parental rights

were not terminated.

¶ 54 Respondent testified that his mother had visits "here and there" with G.B., but "they stopped." Respondent's counsel asked him about the order prohibiting visitation, stating, "To your knowledge, did that [order] deny you the opportunity to attempt to contact him by phone or send him gifts or letters or anything of that nature?" Respondent answered, "From what I remember, there was nothing like that. I wasn't allowed to see him."

¶ 55 Respondent also testified that, if the trial court did not terminate his parental rights, he was willing to do "anything and everything they ask me to, and I'll be at every appointment, anything they need me to."

¶ 56 On cross-examination, respondent testified that, after the January 2024 fitness hearing, he intentionally violated his parole by cutting off his ankle monitor. He explained that he was having difficulty finding employment and he was living "in a hostile halfway house"; he knew that if he did his parole time in prison, "they automatically cut it in half." He said he was "trying to get all of this over and behind me so I can start over, do everything that I am supposed to do as soon as possible to try to be in my kid's life."

¶ 57 d. The Trial Court's Findings

¶ 58 The trial court found that it was in G.B.'s best interest to terminate respondent's parental rights. When ruling, the court first noted that G.B. had been taken into care when he was five weeks old and was now three years old. The court then stated as follows:

> "[G.B.] has special needs, and based on the testimony here today, all of his needs are currently being met by the foster parents. I heard that he is thriving in this situation.
>
> The main issue for me is progress. I look at the period of time this case has

gone on, and *** this is a three-year-old case this month.

I look at the best interest factors in the statute, and I am to consider the safety and welfare of the child, the development of his identity, his background ties, his sense of attachments. I look at the person he looks to day in and day out for his care. Who is the one who puts him to bed. Who is the one that gets him up in the morning. Who bathes him. Who clothes him. Who feeds him. Who takes him to occupational speech therapy. Who takes care of him when he is sick. In answer to that, it's not [respondent]. The answer to that [is] the foster parents.

I am to look at the child's sense of security and sense of familiarity, the continuity of affection for the child. What is the least disruptive placement alternative. The child is not old enough to have long-term wishes. His community ties have all been with someone else.

I look for the need for permanence and the risks attendant to being in substitute care. The fact of the matter is that this is a three-year-old child who has spent his entire life in a foster home. What I have to look at is what is in the best interest of [G.B.] I believe that [G.B.] should not have to linger in foster care any longer.

At this time, given all the best interest factors and clearly by a preponderance of the evidence, I do find that it is in the best interest of [G.B.] that the parental rights of [respondent] be terminated."

¶ 59    This appeal followed.

¶ 60                               II. ANALYSIS

¶ 61    Respondent appeals, arguing that the trial court's (1) fitness and (2) best-interest

determinations were against the manifest weight of the evidence. We disagree and affirm.

¶ 62                                A. Accelerated Appeal Filing Deadline

¶ 63        Initially, we note that this is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Under that rule, this court is required to issue its decision in an accelerated case within 150 days after the filing of the notice of appeal unless there has been "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018).

¶ 64        Here, respondent's notice of appeal was filed on May 9, 2024, meaning this court's disposition was due to be filed by October 7, 2024. That filing deadline has passed. However, we note that respondent's initial counsel on appeal filed four motions for extension of time to file his brief on July 2, 2024, September 10, 2024, November 8, 2024, and January 30, 2025. This court granted each motion. On February 24, 2025, new counsel entered his appearance on behalf of respondent, and on April 28, 2025, respondent filed his opening brief.

¶ 65        Given respondent's motions for extensions of time, we conclude that there is "good cause" for issuing our disposition after the 150-day deadline.

¶ 66                                B. The Fitness Determination

¶ 67        Respondent argues the trial court's finding that he was unfit was against the manifest weight of the evidence. It is well settled that "[b]ecause each of the statutory grounds of unfitness is independent, the trial court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds." *In re Adoption of P.J.H.*, 2019 IL App (5th) 190089, ¶ 11. Based on our review of the record, we conclude that the court's finding that respondent failed to make reasonable progress toward the return of G.B. to his care was not against the manifest weight of the evidence. Accordingly, we discuss only that finding.

¶ 68                                1. *The Applicable Law and the Standard of Review*

¶ 69    The State must prove unfitness as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)) by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28. Section 1(D)(m)(ii) of the Adoption Act defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an adjudication of neglect or abuse. 750 ILCS 50/1(D)(m)(ii) (West 2024). Reasonable progress is an objective view of the steps the parent has taken toward the goal of reunification and examines the demonstrability and quality of those steps. *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 51. Additionally, the Illinois Supreme Court has held "the benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans." *In re C.N.*, 196 Ill. 2d 181, 216 (2001). Reasonable progress exists when the trial court can conclude that, in the near future, it will be able to order the children returned to parental custody. *Ta. T.*, 2021 IL App (4th) 200658, ¶ 51.

¶ 70    A determination of parental unfitness involves factual findings and credibility determinations that the trial court is in the best position to make. *In re M.I.*, 2016 IL 120232, ¶ 21. Accordingly, a trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id.*

¶ 71                                  2. *This Case*

¶ 72    The evidence in this case supports the trial court's finding that respondent failed to make reasonable progress toward the return of G.B. during either of the nine-month periods alleged in the motion for termination of parental rights (January 2022 to October 2022 and October 2022 to July 2023). Vorreyer was the caseworker for nearly the entirety of those

periods, and she testified that respondent did not complete any of the services required of him, which were (1) parenting classes, (2) mental health services, and (3) a sex offender risk assessment. She also testified that during her time as caseworker, there was never a time when she was close to returning G.B. to respondent.

¶ 73        Respondent's incarceration was the primary impediment to his participation in services, but the trial court correctly observed that Illinois law does not make an exception for a parent's incarceration when measuring reasonable progress. *In re J.L.*, 236 Ill. 2d 329, 343 (2010); *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89. Instead, the supreme court, in *J.L.*, stated clearly that "time spent incarcerated is included in the nine-month period during which reasonable progress must be made under section 1(D)(m)(iii). The statute contains no exception for incarcerated parents." *J.L.*, 236 Ill. 2d at 343. The court explained its holding as follows:

> "We conclude the language of section 1(D)(m)(iii) is clear and unambiguous with regard to the question at issue. The statue simply provides that a ground for a finding of unfitness is the '[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following the adjudication of neglected or abused minor *** or dependent minor.' [Citation.] Where the language is clear and unambiguous, courts may not read into it exceptions that the legislature did not express. [Citations.]

> We note, in addition, that the legislature was well aware of the possibility that a parent subject to termination proceedings would be incarcerated. For example, under section 1(D)(r) of the Adoption Act, a parent is unfit if, *inter alia*, she 'is incarcerated as a result of a criminal conviction at the time the petition ***

is filed *** and the parent's incarceration will prevent the parent from discharging his or her parental responsibilities for the child for a period in excess of 2 years after the filing of the petition ***.' [Citation.] Similarly, under section 1(D)(s), a parent is unfit if 'the parent is incarcerated at the time the petition or motion for termination of parental rights is filed, the parent has been repeatedly incarcerated as a result of criminal convictions, and the parent's repeated incarceration has prevented the parent from discharging his or her parental responsibilities for the child.' [Citation.]

However, the legislature included no exception for incarcerated parents in section 1(D)(m)(iii). It is thus inappropriate to infer the legislature intended such an exception." *Id.* at 340-41.

¶ 74 Accordingly, applying the clear precedent of *J.L.*, we measure respondent's progress in services without regard to his status as an incarcerated individual. The evidence shows that respondent made no progress in any of the three services that were required of him.

¶ 75 Respondent contends that, despite the limitations his incarceration placed on him, "the record reflects efforts to engage with caseworkers, participation in available services while incarcerated, and an expressed interest in parenting G.B. once released." We disagree.

¶ 76 Respondent sent one letter to Vorreyer after he was identified as G.B.'s father. He also testified that he made no attempts to reach out to DCFS because he "wasn't able to," explaining, "The only way you can do that is to have family[,] loved ones reach out for you or have a counselor in the institution reach out for you, and I didn't have neither one of those." Yet respondent also testified that (1) his father knew everything about the case, (2) his sister had been in contact with G.B.'s mother,(3) his mother had visitation with G.B. as part of the DCFS

case, and (4) his mother and father were a support system for him and G.B. His claims that he could not reach out to DCFS and did not have family to assist him are belied by the record.

¶ 77 Additionally, the record does not contain any evidence that respondent participated in "available services while incarcerated." Vorreyer testified that respondent told her that (1) DOC did not offer any services and (2) he would have to do them after he was released from incarceration. She stated briefly that respondent "admitted that he gets mental health, but it's not very regularly." This lone reference to "mental health" does not inform us in any way about whether respondent received, engaged in, or progressed in any mental health services during the two nine-month periods alleged in the petition.

¶ 78 Last, an "expressed interest in parenting once released" does not demonstrate measurable progress toward G.B. being returned to respondent's care in the near future.

¶ 79 For the foregoing reasons, we affirm the trial court's finding that respondent was unfit because he failed to make reasonable progress.

¶ 80                          C. The Best-Interest Determination

¶ 81                          1. *The Applicable Law and Standard of Review*

¶ 82 At the best-interest stage of a termination proceeding, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. In reaching a best-interest determination, the trial court must consider, within the context of the child's age and developmental needs, the following factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity,

- 17 -

continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." (Internal quotation marks omitted.) *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32.

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 83       A reviewing court affords great deference to a trial court's best-interest finding because the trial court is in a superior position to view the witnesses and judge their credibility. *C.P.*, 2019 IL App (4th) 190420, ¶ 71. An appellate court "will not disturb the trial court's decision regarding a child's best interests *** unless it is against the manifest weight of the evidence." *Id.* ¶ 68. A best-interest determination is against the manifest weight of the evidence only when the opposite conclusion is clearly the proper result. *Id.*

¶ 84                                    2. *This Case*

¶ 85       The evidence in this case also supports the trial court's finding that it was in G.B.'s best interest to terminate respondent's parental rights.

¶ 86       G.B. was taken into care as a newborn and spent the majority of his life in the home of his foster family. G.B. has bonded with his foster parents, foster siblings, and foster grandmother. In addition, G.B.'s foster parents have (1) provided a loving, stable home, where all of G.B.'s social, educational, and developmental needs are met and (2) committed to adopting G.B. In contrast, G.B., who was three years old at the time of the best-interest hearing, had never even met respondent.

¶ 87        Accordingly, we conclude the trial court's finding that termination of

respondent's parental rights was in G.B.'s best interest was well supported by the record.

¶ 88                                III. CONCLUSION

¶ 89        For the reasons stated, we affirm the trial court's judgment.

¶ 90        Affirmed.